OPINION
{¶ 1} Defendants-appellants Robert M. Bigler and Allied Machine Engineering Corporation (hereinafter "Allied") appeal the December 4, 2001 Judgment Entry of the Tuscarawas County Court of Common Pleas, which reduced to judgment the November 9, 2001 jury verdicts in favor of plaintiff-appellee Patricia Waters on her claims of sexual harassment, intentional infliction of emotional distress, wrongful discharge in violation of public policy, and punitive damages. Appellants also appeal the April 1, 2002 Judgment Entry, granting appellee's application for attorney fees, in which the trial court found Bigler and Allied liable for $236,137.95 in attorney fees, and $2,977.43 in costs.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On April 4, 2000, Waters filed a lawsuit against her former employer, Allied, and Bigler, her immediate supervisor during the first portion of her employment at Allied. Waters claims Bigler and Allied were liable for intentional infliction of emotional distress, and hostile work environment sexual harassment, and claimed Allied was also liable for wrongful discharge in violation of public policy.
 {¶ 3} In December of 1996, Waters attended an employment open house for Allied. Waters' sister, Linda Patterson, worked at Allied and invited her to attend. Bigler interviewed Waters and recommended she be hired.
 {¶ 4} Almost immediately after Waters began working at Allied, Bigler made her feel uncomfortable. Waters testified Bigler stood closer than necessary when talking to her, and engaged in a series of unwelcome comments and advances. Specifically, Waters claims Bigler told her she looked good in her jeans and mentioned he was her boyfriend.
 {¶ 5} Bigler had a reputation at the plant for making unwanted advances to some women. Patterson testified Bigler had sexually harassed her. Patterson testified Bigler had asked her to go out into the parking lot to have sex with him. Patterson testified Bigler made such comments to her frequently. Further, Patterson testified Bigler grabbed her buttocks while at work, and propositioned her and another co-worker to have sex as a Athreesome." When she would not play along, Bigler would retaliate by writing her up for minor infractions which he would normally overlook. Patterson warned Waters to watch out for Bigler.
 {¶ 6} Waters also presented the testimony of other female co-workers, in an attempt to demonstrate Allied was aware of Bigler's conduct. Marissa Potts, a co-worker of Waters, testified Bigler began sexually harassing her by paying her excessive attention, asking her out, and giving her special favors. Potts testified she was harassed after Waters' termination. While there is no record demonstration Waters knew of Bigler's alleged harassment of Potts while employed at Allied, the testimony was presented to demonstrate Allied's acceptance of Bigler's behavior.
 {¶ 7} Michele Green, another co-worker, testified Bigler was too friendly, stood too close, and talked too loudly. While this made her uncomfortable, once she established she was happily planning a wedding, she received less attention and noticed distance between herself and Bigler. Green also testified Bigler would stand together with "a couple of the guys" and "giggle and just look at them and you know, poke fun and talk about the girls that were — and how they would dress or what they looked like and things like that." Tr. at 795-796. Green testified these conversations and actions made her uncomfortable.
 {¶ 8} A few weeks after starting at Allied, Waters went to Bentley's, a local bar, with her girlfriend, Valerie Taylor. During the course of the evening, Waters noticed Bigler and a group of men from Allied. Both Waters and Taylor testified the men were drinking and dancing obnoxiously with sexual overtones. The men made Acat calls" to female patrons. Waters thought Bigler was intoxicated, and noticed his slurred speech and glazed eyes. At closing, Waters and Taylor left the bar and walked toward the parking lot. Taylor stopped to talk to a friend, but Waters continued toward her car. Waters testified Bigler came up behind her, grabbed her around the waist, and ushered her into an isolated area of the parking lot near his car. Bigler was trying to get Waters into his car, and controlled her by holding her arm and grabbing her hair so forcefully that he pulled strands of her hair out. When Waters tried to scream, Bigler forcibly kissed her, covering her mouth and her scream. He attempted to put his hands up her shirt and into her pants, but was unable to negotiate Waters' clothing. Bigler continued to fondle her breast and groin areas despite Waters' protest. Eventually, Waters broke free and rejoined her friend.
 {¶ 9} Taylor testified when she stopped to talk to her friend in the parking lot, she turned away and did not notice exactly what happened to Waters. However, when Taylor turned her attention back to Waters, she saw her walking very quickly to rejoin her. Taylor testified Waters was visibly shaken and upset, and told her about the incident.
 {¶ 10} The following day, Waters went to the police station to file a criminal complaint against Bigler. The investigating officer, Captain Flannigan, testified Waters appeared to fear Bigler and was also concerned about filing a criminal complaint because of work and because Bigler was her supervisor. Captain Flannigan testified Waters was still visibly shaken and intermittently cried at the police station. Captain Flannigan noted Waters' arm had been bruised.
 {¶ 11} As part of the investigation, Captain Flannigan interviewed Bigler. During his interview, Bigler stated he could not have put his hand up Waters' shirt because her clothes were too tight. Captain Flannigan recommended the case be prosecuted. Captain Flannigan instructed Waters to return to work, and not to talk to Bigler unless necessary for work. Waters was not to talk to Bigler about the incident.
 {¶ 12} Waters testified she was terrified whenever Bigler was around her. Throughout the course of the next week, Bigler stopped by her machine several times a day, giving her dirty, intimidating looks. When asked what Bigler was doing around her machine, Waters testified Bigler would Alook her up and down." Waters believed Bigler was trying to intimidate her. Tr. at 769. Waters was constantly looking over her shoulder for him, and cried often. She suffered panic attacks, during which she experienced anxiety, dizziness, shortness of breath, a choking feeling, palpitations and a fear of dying.
 {¶ 13} During one such panic attack the day after the incident, Waters left her work station and went outside to smoke a cigarette. When she went outside, she was comforted by a co-worker, Shawn Rose. Waters committed a violation of company policy by leaving her work station, and both Waters and Rose violated policy by leaving the building during the shift.
 {¶ 14} The first day back to work after the incident, Bigler told the plant manager, John Dummermuth, Waters had filed a criminal complaint against him. Bigler told Dummermuth he was very upset about the complaint. Bigler testified Dummermuth consoled him and told him to use Dummermuth's office if Bigler needed a break or to collect his thoughts. Even after discussing the incident, neither Bigler nor Dummermuth thought a shift-change for Waters was necessary or appropriate. Instead, Dummermuth decided it would be Abusiness as usual." Tr. at 1111.
 {¶ 15} The next day, Dummermuth called Waters into his office, which was located in a trailer behind the plant. Notwithstanding the fact Dummermuth's brother, Jay Dummermuth, was Allied's Human Resources Manager, the plant manager decided to hold the meeting to discuss the infraction Waters had committed by leaving her machine and leaving the building the previous day. Waters told the plant manager she had to go outside because she was having a panic attack. When Dummermuth asked why, Waters told him she was not permitted to talk about it. Thereafter, Dummermuth informed Waters he knew why she had to go outside as he had been informed about the incident at Bentley's.
 {¶ 16} John Dummermuth then asked Waters if she drank. Waters testified she told him she did not, and he replied, "then you don't understand what Mike was going through when that night happened, you don't understand * * * well I don't think its right because you don't drink, you don't understand." Tr. at 768. Ultimately, the plant manger testified he decided no action would be taken against Waters for her policy infractions because he wanted to give her the benefit of the doubt after the alleged incident.
 {¶ 17} Waters was shocked by the meeting and the plant manager's statements. Throughout the course of the next week, Bigler, still her direct supervisor, continued to come around her two or three times a day, and continued to give her dirty looks. Waters testified Bigler came around her machine more often in the days following the incident than in the time before the incident.
 {¶ 18} By the end of the week, Waters could no longer endure the work conditions. On April 8, 1997, Waters went to Jay Dummermuth, the Human Resources Manager. Patterson accompanied Waters to Jay Dummermuth's office. During the meeting, Waters told Dummermuth Bigler gave her dirty looks and came around her machine more often. She told Dummermuth she felt uncomfortable and very intimidated working under Bigler's supervision. Jay Dummermuth interrupted her, and told her he would not fire Bigler. Waters testified Jay Dummermuth threw his hands in the air and said, AIf you pursue these charges, if you pursue this and he [Bigler] goes to jail, one of you will be fired and it will not be [Bigler] because it took seven months to [train him.]" Tr. at 770. Waters was concerned she would be fired and/or that Bigler would hurt her again, so she withdrew her criminal complaint. She explained to Captain Flannigan she was dismissing her complaint because she felt that it would be better for her in the long run, and because she feared retribution from Bigler if she proceeded.
 {¶ 19} On direct examination, Jay Dummermuth testified he believed Waters was making a sexual harassment complaint. While Allied's sexual harassment policy mandated immediate investigation, Jay Dummermuth did not investigate Waters' complaints. He told Waters he would "see what he could do" about giving her a transfer. Ultimately, he did not transfer Waters or permit her to change shifts. After two weeks, there was a plant wide shift change, during which all employees, including Waters, were permitted to choose different shifts. Waters chose a shift under the supervision of Don Stropki.
 {¶ 20} Waters testified Stropki treated her fairly at all times. Further, Waters testified her work situation improved dramatically because Bigler was not around. After she dropped her criminal complaint, Waters had no further incidents with Bigler at work.
 {¶ 21} Stropki testified Waters was transferred to his supervision after the plant-wide shift change. According to Stropki, John Dummermuth, the plant manager, told him Bigler was not to take any disciplinary action against Waters. Any disciplinary action, even if initiated by Bigler, was to be documented by Stropki or the other supervisor, Levi Miller.
 {¶ 22} On May 30, 1997, Allied evaluated Waters as part of her ninety-day probationary period. Miller and Stropki performed the evaluation. Waters received a very low performance score of 44 out of 115 indicating "improvement essential." At trial, Waters presented evidence Allied selectively imposed a super-probationary period on her, demonstrating other employees who received Aimprovement essential" evaluations were not placed on probation. Michele Green testified she received an Aimprovement essential" evaluation, but was not placed on probation. In rebuttal, Allied presented evidence another worker was also given a super-probationary period after receiving an "improvement essential" evaluation. That worker met the probationary hurdles.
 {¶ 23} Waters did admit she did not perform well and that her evaluation was a fair reflection of her performance. Because of this inadequate performance, Allied constructed a super-rigorous program for the remainder of Waters' probationary period. The understanding was if Waters complied with the more rigorous standards, she would be permitted to keep her job. Jay Dummermuth testified he did not recall Bigler recommending any criteria comprising the super-probationary period. However, Stropki, Miller and Bigler did recall Bigler's involvement.
 {¶ 24} After Waters received her "improvement essential" evaluation, Stropki, Miller, and Bigler met to discuss the extended probation. Bigler felt Waters needed to prove she wanted to work at Allied. Tr. at 1713. As a result of this meeting, Waters was required to meet stricter performance criteria for ten days in order to continue her employment. Specifically, Waters was required to meet a 95% proficiency rating and have no absences. If she met this performance criteria over a ten day period, she would then be placed upon an extended thirty day probation period. Waters survived the ten day probation and was placed on an extended thirty day probation. Over that thirty day period Waters had to average a 100% proficiency rating and have no absenteeism.
 {¶ 25} Apparently, during this period of time, Waters broke her tooth and had two absentee write-ups because of the condition of her tooth. However, Stropki and Miller both indicated these absences were excused and would not effect the super-probationary conditions. There was other contradictory testimony with regard to the extended thirty-day probation. At trial, Waters testified she succeeded in maintaining a 100% efficiency rating over this thirty day probation period. Stropki and Michael Stokey, an Allied vice-president, testified while on paper there appeared to be over a 100% efficiency rating, other factors noted on the evaluation indicated the number was not accurate. Waters testified Stropki told her she was doing great and would pass her probation. However, Stropki testified he made no such promise.
 {¶ 26} Stropki testified he was normally involved in the decision to terminate any person he supervised. In the seven years proceeding this event, he had been involved in every such decision. Further, Jay Dummermuth, the Human Resources manager, stated any decision to terminate an employee was ultimately made after he and his brother consulted with Michael Stokey. In this instance, John Dummermuth, the plant manager, failed to first consult with his brother or with Stokey. Further, John did not obtain Stropki's opinion or recommendation. Instead, he called Stropki and told him he was about to terminate Waters for poor efficiency. During his direct testimony, Bigler testified he recommended Waters be terminated.
 {¶ 27} At trial, John Dummermuth claimed Waters was fired because of her absenteeism, a scrap violation, and the incident when she left the building. Bigler was responsible for the absentee violation writeup immediately after the Bentley's incident when Waters left the building. Bigler also signed the scrap violation after the incident at Bentley's, and before Waters was transferred to the next shift. The remaining absentee incident contained in Waters' file was the incident where she left the plant immediately after she injured her tooth at work, for which she was excused. Two of these events took place before the super-probationary period. Further, Stropki testified these incidents were not the reasons John Dummermuth gave to Waters at the termination meeting.
 {¶ 28} John Dummermuth admitted on cross-examination that he did not consult with the human resources' manager in deciding to terminate Waters. Further, John Dummermuth went outside of normal policy in that he did not consult with Jay Dummermuth or Waters' immediate supervisor, Stropki.
 {¶ 29} Immediately after being terminated, Waters complained to Jay Dummermuth her termination was bogus, and she had fulfilled the performance requirements for her thirty day probation period. After investigating Waters' performance, Jay Dummermuth told his immediate supervisor, Michael Stokey, he agreed with the decision to fire Waters, but was concerned Waters would have a claim for wrongful discharge if the reason for her termination remained poor performance. A review of Waters' employment file indicated her efficiency rating, at least on paper, satisfied the terms of her thirty day probation period. Jay Dummermuth suggested Waters be terminated for sexual misconduct. In a memo to the Vice President, Jay Dummermuth wrote, "Although her work performance had improved, her personal conduct bordered on prostitution." Trial Exhibit 12. At trial, Jay Dummermuth explained his brother, John Dummermuth, had led him to believe three men had complained about Waters soliciting sex for money in Allied's parking lot.
 {¶ 30} At trial, each of the three men identified as complaining about Waters denied making these complaints. Brian Graff, an employee of Allied for over six years, testified about a "bizarre" conversation he had with John Dummermuth before Waters' termination. Tr. at 621. During this conversation, John Dummermuth asked if Graff ever had a sexual relationship with Waters. At that time, Graff told him no and Akinda laughed it off." Tr. at 621.
 {¶ 31} Brian Farmer also testified about a similar conversation he had with John Dummermuth preceding Waters' termination. Farmer testified after the Bentley's incident, John Dummermuth approached him and told him his attendance record was not that good, he should watch his step, and there were some issues between Waters and a supervisor. John Dummermuth told Farmer he should not go wandering around the shop talking to people. Dummermuth also asked Farmer if Farmer had a sexual relationship with Waters. Farmer responded he had no relationship outside of Allied with Waters. Farmer also testified he never told John Dummermuth that Waters offered to take him out into the parking lot to have sex for money.
 {¶ 32} Finally, the jury heard from Shawn Rose, another employee of Allied. Rose had accompanied Waters out of the building the day after the Bentley's incident. Rose testified although he could not recall exactly, he believed it was John Dummermuth who called him to the office to discuss a situation regarding Waters. Dummermuth told Rose he had heard things about Asexual stuff in the parking lot" and asked Rose if he knew anything about it. Tr. at 1442. Rose testified he had no complaint about Waters before this point and did not know what prompted the meeting.
 {¶ 33} John Dummermuth asked Rose to prepare a statement. Rose testified he felt pressured and complied with the request to prepare a statement. However, at trial, Rose testified his statement was untrue. Rose never told Dummermuth his statement was untrue. Bigler admitted he talked to Rose about delivering the statement. Thereafter, Bigler assisted Rose in finding an inter office memo envelope for the statement and hand-delivered the statement to the management offices.
 {¶ 34} After consultation with Stokey, Jay Dummermuth arranged another meeting with Waters, to discuss the alternate reason for Waters' termination, her sexual misconduct. During a forty-five minute meeting between Waters, Jay Dummermuth, and John Dummermuth, Jay explained the "true" reason for Waters' termination was because she had been soliciting male employees out to her car, on the premises of Allied, for the purposes of performing sexual favors. Jay Dummermuth told Waters he had statements from employees to back up these allegations, although at trial, Jay Dummermuth admitted he lied about having such statements. Further, Jay Dummermuth testified no investigation into these charges had been conducted. Waters asked to see the statements, and Jay Dummermuth refused. During his testimony, John Dummermuth conceded Rose's statement was not credible and could not be a legitimate reason to fire Waters.
 {¶ 35} Immediately after the meeting, Patterson saw John Dummermuth come out of the back of the plant offices, walk straight through the machines, past her machine, and directly toward Bigler. After a brief conversation, Patterson heard Bigler make a whooping sound as if he were happy, and saw him "high five" the plant manager. Tr. at 993-994.
 {¶ 36} As a result of these events, Waters fell into a deep depression, lost over twenty pounds, suffered from nightmares, and was terrified of men. She called a local hotline at the Fox Run Hospital immediately after the Bentley's incident, and again after her termination for approximately two months. Over the next two years, Waters went through fifteen jobs, leaving them because she was uncomfortable working with men and feared she would be attacked.
 {¶ 37} Waters presented the testimony of her counselor, Kim Mlinarik, a licensed social worker, who opined Waters was suffering from post-traumatic stress disorder. Allied and Bigler countered with the testimony of Dr. Kenny. Dr. Kenny testified the incident at Bentley's was sufficiently serious to become the predicate for post-traumatic stress disorder. He further opined to a reasonable degree of medical probability the cause of Waters' Aanxiety, panic and depression disorders [was] both the assault as well as Allied's treatment of her as well as any other stressors that were going on at that time." Tr. at 1608.
 {¶ 38} After hearing all the evidence, the jury found Bigler liable to Waters for sexual harassment, and awarded $25,000 as compensatory damages. The jury also found Bigler was liable for intentional infliction of emotional distress, and awarded damages in the amount of $75,000. Further, the jury awarded punitive damages against Bigler in the amount of $5,000.
 {¶ 39} The jury also found Allied to be liable to Waters for sexual harassment in the amount of $25,000; against Allied for the claim of intentional infliction of emotional distress in the amount of $75,000; against Allied on their claim for wrongful discharge as against public policy in the amount of $40,000; and awarded punitive damages against Allied in the amount of $280,000. Upon motion of Waters, the jury found Waters was entitled to attorney fees.
 {¶ 40} After the trial, Bigler and Allied filed motions for judgment notwithstanding the verdict and in the alternative, motions for a new trial. Waters filed a motion for prejudgment interest and an application for attorney fees with supporting documentation. On February 19, 2002, the trial court conducted an evidentiary hearing on the post trial issues. In an April 1, 2002 Judgment Entry, the trial court denied both Bigler's and Allied's motions for judgment notwithstanding the verdict, and their motions for a new trial. Further, the trial court awarded Waters attorney fees and costs against Allied and Bigler, jointly and severely, in the amount of $236,137.95, and costs in the amount of $2,977.43. Finally, the trial court denied Waters' motion for prejudgment interest.
 {¶ 41} On April 25, 2002, Allied filed its appeal. On April 29, 2002, Waters filed a cross-appeal. Thereafter, on April 30, 2002, Bigler filed an appeal. Waters did not file a separate cross-appeal against Bigler. On May 17, 2002, Waters sought to consolidate the two appeals before this Court. However, this Court denied Waters' motion to consolidate. Further, this Court denied Waters' motion to modify the docket nunc pro tunc to reflect her timely filed cross-appeal against Bigler. Accordingly, within this opinion we address Allied's appeal assigned Case No. 02AP040032, and the cross-appeal attached thereto, and Bigler's appeal assigned Case No. 02AP040034.
 {¶ 42} Bigler assigns the following errors for our review:
 {¶ 43} "I. The Trial Court Committed Reversible Error In Failing To Grant
 {¶ 44} Bigler's Motion For Judgment Notwithstanding The Verdict Because Plaintiff Filed Her Intentional Infliction Of Emotional Distress Beyond The Applicable Statute Of Limitations Period.
 {¶ 45} "II. The Trial Court Committed Reversible Error In Failing To Grant Bigler's Motion For Judgment Notwithstanding The Verdict Because Plaintiff Failed To Establish A Claim Of Intentional Infliction Of Emotional Distress.
 {¶ 46} "III. The Trial Court Committed Reversible Error In Failing To Grant Bigler's Motion For Judgment Notwithstanding The Verdict Because Plaintiff Failed To Establish A Claim Of Sex Harassment/hostile Work Environment.
 {¶ 47} "IV. The Trial Court Committed Reversible Error When It Failed To Grant Bigler's Motion For A New Trial Because The Jury's Verdict Is Contrary To The Weight Of The Evidence.
 {¶ 48} "V. The Trial Court Committed Reversible Error When It Failed To Grant Bigler's Motion For A New Trial Or Remittitur Because The Jury's Award Of $75,000 In Emotional Distress Damages Is Unsupported By And Contrary To The Weight Of The Evidence.
 {¶ 49} "VI. The Trial Court Committed Reversible Error By Granting Plaintiff's Application For Attorneys Fees."
 {¶ 50} In Allied's appeal, the following errors are assigned for our review:
 {¶ 51} "I. Plaintiff Has Failed To Offer Any Evidence Of Workplace Harassment For Which Allied Should Be Held Liable.
 {¶ 52} "II. The Trial Court Erred By Admitting The Testimony Of Marissa Potts, Michelle Green And Linda Patterson.
 {¶ 53} "III. Plaintiff Has Failed Her Proposition That A Punitive Damage Claim Can Be Supported By Jury Instruction Given To The Jury.
 {¶ 54} "IV. The Trial Court Erred By Not Submitting An Initial Interrogatory To The Jury.
 {¶ 55} "V. Plaintiff Has Failed To Submit Any Evidence Which Support The Exclusion Of Dr. Kenney's Testimony Under Ohio Law.
 {¶ 56} "VI. Request For A New Trial.
 {¶ 57} "VII. Plaintiff Has Simply Aided [sic] The Award Issued By The Trial Court On The Issue Of Attorney Fees."
 {¶ 58} In her cross-appeal, Waters assigns the following error for our review:
 {¶ 59} "The Trial Court Abused Its Discretion In Failing To Award Prejudgment Interest Since The Appellant Failed To Rationally Evaluate Its Risks Or Alternatively, The Appellant Failed To Respond In Good Faith To Ms. Waters' Offer Of Settlement."
 APPELLANT BIGLER'S APPEAL I. {¶ 60} In his first assignment of error, Bigler argues that the court erred in failing to grant his motion for judgment notwithstanding the verdict on Waters' claim for intentional infliction of emotional distress. Bigler argues that the action was filed beyond the applicable statute of limitations, as the claim was premised upon the claim of assault and battery which took place at Bentley's. Because the applicable statute of limitations for intentional infliction of emotional distress based on an assault and battery is one year, Bigler argues that the court erred in permitting the claim to proceed. Waters argues that her intentional infliction of emotional distress claim is premised on her claim of sexual harassment and the hostile work environment Bigler helped create, and therefore subject to a six-year statute of limitations.
 {¶ 61} Because this issue comes to us upon denial of Bigler's motions for directed verdict and judgment notwithstanding the verdict, we review this issue in a light most favorable to Waters. Posin v. A.B.C.Motorcourt Hotel, Inc. (1976), 45 Ohio St.2d 271.
 {¶ 62} In Doe v. First United Methodist Church (1994),68 Ohio St.3d 531, the Supreme Court of Ohio stated that in order to determine the applicable statute of limitations on a particular claim which is not specifically set forth by statute, it is necessary to determine the true nature or subject matter of the acts giving rise to the complaint, rather than the form in which the action is pled. InDoe, a young man sued a former choir director for battery, negligence, and intentional infliction of emotional distress. The claims arose out of incidents involving sexual activity between the plaintiff and the choir director, that were initiated by the choir director. The Supreme Court held that the claim for relief premised upon acts of sexual abuse is subject to a one-year statute of limitations for assault and battery, even where pled as negligence and intentional infliction of emotional distress. Id. at 537.
 {¶ 63} In the instant case, appellants' cause of action for intentional infliction of emotional distress against Bigler is premised on the sexual assault occurring in the parking lot of the Bentley's. While her complaint alleges that throughout her employment, in particular from March 28, 1997, through July 9, 1997, Bigler knowingly engaged in extreme and outrageous conduct knowing it was likely to cause her serious emotional distress, the only conduct in the record, viewed in a light most favorable to Waters, which rises to the level of extreme and outrageous is the sexual assault in the Bentley's parking lot. Following the event in the parking lot, the only conduct she points to involving Bigler involved looks and smirks. This conduct is not extreme and outrageous as a matter of law. Further, the added significance given to the looks and smirks results solely from the incident occurring in the Bentley's parking lot. The date she points to in her complaint, March 28, 1997, is the date of the Bentley's incident. As Waters' claim for intentional infliction of emotional distress against Bigler is premised on the sexual assault, the applicable statute of limitations is one year pursuant to R.C. 2305.111. The court erred in failing to direct a verdict or grant the judgment notwithstanding the verdict in favor of Bigler on the claim for intentional infliction of emotional distress.
 {¶ 64} Bigler's first assignment of error is sustained.
 II {¶ 65} In his second assignment of error, Bigler argues that Waters' intentional infliction of emotional distress claim failed as a matter of law because she was unable to present evidence sufficient to support a verdict on the claim.
 {¶ 66} In Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, the Ohio Supreme Court held that one who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability. Id. at syllabus one. A plaintiff must show that the defendant intended to cause emotional distress, or knew or should have known that the action taken would result in serious emotional distress; the defendant's conduct was extreme and outrageous; the defendant's actions proximately caused psychic injury to the plaintiff; and the mental anguish suffered by the plaintiff was serious. Hanley v.Riverside Methodist Hospital (1991), 78 Ohio App.3d 73, 82. Conduct rises to the level of extreme and outrageous only if it goes beyond all bounds of decency, so as to be regarded as atrocious and intolerable in a civilized society. Perkins v. Lavin (1994), 98 Ohio App.3d 378, 383. As a matter of law, the conduct must be more than mere insults, indignities, threats, annoyances, petty aggressions, or other trivialities. Mason v. U.S. Fidelity and Guarantee Company (1990),69 Ohio App.3d 309, 317.
 {¶ 67} As noted in assignment of error I, any claim for intentional infliction of emotional distress based upon the incident at Bentley's is barred by the statute of limitations, as the action was premised on an assault and battery. All other conduct engaged in by Bigler at the work site did not rise beyond the level of insults, indignities, threats, annoyances, petty aggressions, or other trivialities.
 {¶ 68} The second assignment of error is sustained.
 III {¶ 69} In appellant's third assignment of error, he maintains Waters failed to present sufficient evidence to sustain her claim for sexual harassment. We disagree.
 {¶ 70} In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. Hampel v. Food Ingredients Specialties, Inc., 89 Ohio St.3d 169,2000-Ohio-128, par. 2 syllabus. In order to determine whether the harassing conduct was "severe or pervasive" enough to affect the conditions of the plaintiff's employment, the trier of fact, or the reviewing court, must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment. Id. at par. 5 of syllabus.
 {¶ 71} In this assignment Bigler maintains the only evidence of sexual harassment was the comment he made about being Waters' boyfriend; the comment he made that she looked good in her jeans; the incident at Bentley's; and the smirks and dirty looks he gave Waters after the Bentley's incident. Appellant contends this evidence was simply insufficient to rise to the level of a hostile work environment. However, this is not the only evidence the jury heard to support her claim.
 {¶ 72} We agree with Bigler that the comments he made about her looking good in her jeans and about being her boyfriend do not rise to the level of hostile-environment sexual harassment. However, the incident at Bentley's, which was a physical and verbal assault, changed the climate of the workplace, and tainted all later actions taken by Bigler toward Waters. Waters testified that following the attack at Bentley's, Bigler engaged in intimidating behavior toward her at the workplace. Further, Bigler was still in a supervisory position over her, and the company was aware of the incident occurring at Bentley's and Waters fear in being in close proximity to Bigler. Based on the totality of the circumstances surrounding the incident at Bentley's and the behavior occurring afterward, there was sufficient evidence to sustain a claim for sexual harassment.
 {¶ 73} The third assignment is overruled.
 IV. {¶ 74} In his fourth assignment of error, Bigler maintains the trial court erred in failing to grant his motion for a new trial because the jury's verdict was contrary to the weight of the evidence. We disagree.
 {¶ 75} The decision as to whether a motion for new trial should be granted lies within the sound discretion of the trial court, and its ruling will not be reversed upon appeal absent a showing of an abuse of discretion. Verbon v. Pennese (1982), 7 Ohio App.3d 182, 184. An abuse of discretion is more than just an error of judgment or law; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When considering a Civ.R. 59(A)(6) motion, the trial court must weigh the evidence and pass on the credibility of the witnesses. The trial court's consideration of weight and credibility is not the same as that employed by the jury, but in a more restricted sense of whether it appears to the trial court that manifest injustice has been done and that the verdict is against the weight of the evidence. Rohde v. Farmer (1970), 23 Ohio St.2d 82, paragraph three of the syllabus. A trial judge should "`abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result.'" Bland v. Graves (1993),85 Ohio App.3d 644, 651.
 {¶ 76} Specifically, appellant maintains because Waters Aconstantly changed her testimony" her testimony was left without any credibility. The jury heard testimony not only from Waters, but also from appellant, Jay and John Dummermuth, Patterson, Stropki, and Dr. Kenny. When reviewing all the evidence, we find the jury did have competent, credible evidence upon which it could conclude appellant was liable for hostile environment sexual harassment. The jury was in the best position to judge the credibility of the witnesses, including Waters. We cannot find the trial court abused its discretion in denying the motion for a new trial where the record demonstrates there was competent credible evidence to support the jury's verdict on the sexual harassment claim.
 {¶ 77} Bigler's claim as to new trial concerning the claim for intentional infliction of emotional distress is rendered moot by our decision in Assignments of Error I and II above.
 {¶ 78} Appellant's fourth assignment of error is overruled.
 V {¶ 79} In Bigler's fifth assignment of error, he maintains the trial court erred in denying his motion for a new trial based upon the jury's excessive award for compensatory damages. Civ.R. 59(A)(6) permits a trial court to order a new trial or a remittitur of a jury's award when the verdict was excessive and the moving party can demonstrate the verdict was influenced by passion or prejudice.
 {¶ 80} As to the claim that damages were excessive for sexual harassment, appellant's own expert, Dr. Kenny, conceded the Bentley's incident, if true, was sufficient to trigger post traumatic stress disorder. Further, Dr. Kenny testified Waters's close proximity to appellant would make the development of post traumatic distress disorder even more likely. In light of all of the other facts before the jury, we cannot find the trial court abused its discretion in denying appellant's motion for a new trial based upon the verdicts being excessive.
 {¶ 81} Appellant's fifth assignment of error is overruled.
 VI. {¶ 82} In Bigler's sixth assignment of error, he maintains Waters was not entitled to attorney fees because she was unable to prove the amount of attorney fees was reasonable. Essentially, Bigler makes the same arguments herein as the arguments presented in Allied's seventh assignment of error. For the same reasons set forth therein, Bigler's sixth assignment of error is overruled.
ALLIED'S APPEAL
 I. {¶ 83} In its first assignment of error, Allied argues that the court erred as a matter of law in failing to grant its motion for judgment notwithstanding the verdict.
 {¶ 84} A motion for judgment notwithstanding the verdict must be denied where reasonable minds may reach different conclusions based on the evidence adduced at trial and the facts established by admissions in the pleadings and in the record, construing the evidence in the light most strongly in favor of the party against whom the motion is made.Possen, supra.
 {¶ 85} Allied first argues that Waters failed to provide the jury with sufficient evidence of a sexual harassment claim in violation of R.C. 4112.02.
 {¶ 86} R.C. 4112.02 prohibits an employer from engaging in discriminatory practices and states, in relevant part:
 {¶ 87} "It shall be an unlawful discriminatory practice:
 {¶ 88} "(A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
 {¶ 89} Allied contends the evidence adduced at trial was absolutely devoid of sexual harassment in the work place. Allied engages in an examination of the evidence which presents the evidence in a light most favorable to Allied. Allied points out the record demonstrates Waters never told Allied management about the two comments Bigler made to her prior to the assault. Further, Waters never told management Bigler stood too closely to her. Allied then states this was the totality of the evidence presented by Waters which represented sexual harassment in the work place. Further, Allied points out that any alleged assault by Bigler took place outside the work place and Bigler never did anything of a sexual nature in the work place. Allied argues Jay Dummermuth immediately contacted the investigating officer of the criminal assault to determine whether or not Bigler should be excluded from Waters' presence. Finally, Allied argues even if true, Bigler giving Waters dirty looks would be insufficient to establish sexual harassment.
 {¶ 90} However, as discussed above in detail in Bigler's third and fourth assignments of error, the evidence also supported another conclusion. The jury heard, as did the judge, evidence both Jay and John Dummermuth knew of the sexual assault and yet held meetings with Waters essentially chastising her for bringing a criminal action. Jay Dummermuth testified he never looked into Waters' complaints, notwithstanding a company policy to do so. Waters was not permitted to change shifts until the plant wide shift change. Further, Bigler was permitted to fashion a probationary period for Waters and ultimately recommended Waters' termination.
 {¶ 91} Further, while Adirty looks" alone may not be sufficient to create a sexually hostile work environment, the fact Bigler continued to attempt to intimidate Waters after the sexual assault and with the full knowledge of the human resources manager, and arguably the plant manager, could easily have created a sufficiently severe or pervasive effect on the terms and conditions of Waters' employment. The trier of fact must view the totality of the circumstances in making its determination whether a sexually hostile work environment existed.
 {¶ 92} We also find the fact the sexual assault took place outside of the work place does not preclude consideration of the effect such assault had on the sexual harassment claim. In this instance, Bigler was Waters' immediate supervisor. Therefore, any contact Bigler may have had with Waters on Allied's premises after the assault was inherently tainted by the assault. The tenor of Waters' relationship with Bigler, even on purely professional issues, was inextricably intertwined with the sexual and violent nature of the assault. What once may have been an "innocent," albeit ill-advised, dirty look is now laced with the memory of a volatile act and the fear of potential similar acts.
 {¶ 93} Allied was aware of the incident. Armed with this knowledge, John Dummermuth, in consultation with Bigler, decided it would be best to leave Bigler as Waters' supervisor. Waters' appeal to Jay Dummermuth fell on deaf ears when Jay did not transfer Waters to a different shift. Jay also failed to investigate the claims, even though he knew company policy required immediate investigation.
 {¶ 94} When taking the evidence in a light most favorable to Waters, we find there was sufficient evidence upon which a jury could conclude Allied created and permitted a sexually hostile work environment. Accordingly, this portion of Allied's first assignment of error is overruled.
 {¶ 95} Allied next argues that the Waters was unable to support a claim of intentional infliction of emotional distress. Allied first claims because Waters' claim was premised on an alleged sexual assault, the appropriate statute of limitations was one year.
 {¶ 96} As discussed in assignment of error I raised by Bigler, the only conduct of Bigler's which rose to level of extreme and outrageous was the sexual assault in Bentley's. This claim for intentional infliction of emotional distress was barred by the one year statute of limitations. Further, as the incident took place in an area outside the control of Allied, and outside of working hours, Allied cannot be held responsible for intentional infliction of emotional distress based solely on the claim.
 {¶ 97} Taking the evidence in a light most favorable to Waters, most of the evidence against Allied is insufficient to support a claim for intentional infliction of emotional distress as a matter of law. Evidence that Jay Dummermuth threatened to fire Waters if she did not drop her criminal complaint, and that he did not change her shift or supervisor based upon the incident, is insufficient as a matter of law to rise to the level of extreme and outrageous. The allegations that Dummermuth solicited statements of immoral conduct and prostitution involving Waters, which were later determined to be fabricated, may rise to the level of extreme and outrageous. However, when reviewing this claim under the standard set forth by the Supreme Court in Doe, supra, these claims are in the nature of slander, governed by the one-year statute of limitations set forth in R.C. 2305.11(A).
 {¶ 98} The court erred in failing to grant the judgment notwithstanding the verdict on the claim for intentional infliction of emotional distress.
 {¶ 99} Next, Allied argues that Waters failed to demonstrate retaliatory discharge in violation of R.C. 4112.02.
 {¶ 100} A prima facie case of retaliation is established by showing: 1) the plaintiff engaged in a protected activity; 2) the defendant knew plaintiff engaged in this activity; 3) the defendant took an employment action adverse to the plaintiff; and, 4) there was a causal connection between the protected activity and the adverse employment action. Baker v. The Buschman Co. (1998), 127 Ohio App.3d 561, 567-568,713 N.E.2d 487.
 {¶ 101} Allied contends Waters cannot establish a protected activity. Specifically, Allied argues Waters stated she did not consider the complaint to be about sexual harassment and did not consider any conduct of Bigler following the criminal assault to be sexual in nature. We disagree with Allied's contentions.
 {¶ 102} The jury heard testimony from Jay Dummermuth indicating that he believed Waters was utilizing Allied's sexual harassment policy in making this complaint. Even so, Allied took no action under its own sexual harassment policy. Waters had conversations with John Dummermuth, wherein John Dummermuth indicated Waters could not understand what Bigler was going through because she did not drink. Waters also had a conversation with Jay Dummermuth that she would be fired if she did not drop the criminal complaint. The jury heard testimony Waters engaged in an activity protected by Title 7 and R.C. 4112.20, in that she made a complaint based upon sexual harassment. Jay Dummermuth testified he believed her complaints to be made under the sexual harassment policy. Thereafter, Allied took adverse employment action against Waters and subjected Waters to severe and/or pervasive retaliatory harassment by failing to investigate; failing to change her supervisor; permitting Bigler to participate in her probationary process; permitting Bigler's input into the termination decision; deciding to terminate her for reasons unsupported by Waters' employment file; and finally by recalling Waters to justify her termination on the basis of alleged immoral conduct. We find the jury had sufficient evidence to establish a causal connection between Waters' complaints of sexual harassment and the adverse employment actions taken against her.
 {¶ 103} Because we find Waters established a prima facie case of retaliatory discharge, we need not separately analyze appellant's claim Waters failed to establish a public policy retaliatory discharge claim with regard to the filing of criminal charges.
 {¶ 104} Allied's assignment of error is overruled as to the claims for sexual harassment and retaliatory discharge.
 {¶ 105} The assignment of error is sustained as the claim for intentional infliction of emotional distress.
 II. {¶ 106} In its second assignment of error, Allied argues that the court abused its discretion in admitting the testimony of three of Waters co-workers, Marissa Potts, Michelle Green, and Linda Patterson.
 {¶ 107} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173.
 {¶ 108} Allied argues that the testimony of these women concerning conduct by Bigler was inadmissible, as they testified to conduct directed at themselves, of which Waters was unaware. Allied argues that Waters failed to testify that her subjective work environment was affected by the conduct described by Green, Potts, or Patterson.
 {¶ 109} Evidence of sexual harassment directed at employees other than the plaintiff is relevant to demonstrate a hostile work environment. E.g., Tschantz v. Ferguson (1994), 97 Ohio App.3d 693, citing Hall v. Gus Constr. Co., Inc. (C.A.8, 1988), 842 F.2d 1010.
 {¶ 110} Appellant's reliance on Drawl v. Cleveland OrthopedicCtr. (1995), 107 Ohio App.3d 272, is misplaced. The Drawl case concerned the admission of testimony involving a period of time where the plaintiff was not employed by the defendant. The case did not deal with the issue of awareness of the other harassment.
 {¶ 111} Allied has not demonstrated that the court abused its discretion in admitting this testimony, which was relevant to show Allied's awareness of the environment at the time. The second assignment of error is overruled.
 III {¶ 112} In its third assignment of error, Allied argues that the court erred in the jury instruction concerning punitive damages.
 {¶ 113} R.C. 2315.21 governs the recovery of punitive and exemplary damages in tort actions. For a plaintiff to recover punitive damages in a tort action, the plaintiff must show by clear and convincing evidence "[t]he actions or omissions of [the] defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate[.]" R.C.2315.21(B)(1) and (C)(2). Actual malice for the purpose of awarding punitive damages is "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" Calmes v. GoodyearTire Rubber Co. (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416, quoting Preston v. Murty (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.
 {¶ 114} Allied argues that the court improperly instructed the jury that it could award punitive damages based on oppression or insult, rather than properly instructing that they must find actual malice.
 {¶ 115} While the instruction concerning oppression and insult, taken by itself, may have improperly suggested to the jury a lower standard for punitive damages than that provided by law, reading the instruction in its entirety, the court properly instructed the jury concerning the appropriate standard. Before the instructions concerning oppression and insult, the court instructed the jury that it could award punitive damages only if it found by clear and convincing evidence that a particular defendant's acts demonstrated actual malice, oppression, or insult. Tr. 1950-1951. However, the court continued that the jury may not award punitive damages unless it finds by clear and convincing evidence that the defendant acted with actual malice. Tr. 1951. The court then defined the term Aactual malice" for the jury as the state of mind characterized by hatred, ill will, a spirit of revenge, or conscious disregard for the rights and safety of other persons, that has a great probability of causing substantial harm. Id. The court defined "substantial," "oppression," and "insult" for the jury. Viewed in the entire context, we conclude that the objected to portion of the instruction, involving oppression and insult, does not require reversal, as the court did instruct the jury that they were required to find actual malice by clear and convincing evidence.
 {¶ 116} Allied also argues that the evidence did not warrant a jury instruction on punitive damages, as there is no evidence of actual malice. We disagree. The acts taken by Allied following Bigler's sexual assault on Waters at Bentley's, as outlined earlier in the opinion, are sufficient to warrant a jury instruction on actual malice.
 {¶ 117} The third assignment of error is overruled.
 IV {¶ 118} In it fourth assignment of error, Allied argues that the court erred in failing to submit additional interrogatories to the jury to test the punitive damage award before the jury was discharged.
 {¶ 119} The damage hearing in the instant case was bifurcated. The jury returned a verdict in favor of Waters on all claims against Bigler and Allied, and returned a verdict that punitive damages were to be awarded in favor of Waters against both defendants. The jury did not award an amount of punitive damages at that time, as the amount of punitive damages was to be determined at a second hearing. The reason for the bifurcation was to prevent prejudice from presenting evidence of the financial condition of Allied during the trial. Tr. 2075.
 {¶ 120} Allied did not request the interrogatories to test the punitive damage award until before the second portion of the bifurcated hearing. Under Civ.R. 49(B), a trial court is not obligated to consider a proposed interrogatory unless is it is timely presented to the court prior to the commencement of argument. The court did not err in failing to submit the interrogatory which was submitted to the court after the jury returned its initial verdict, but shortly before the hearing which was limited to the amount of punitive damages. Allied requested that the interrogatory specify what act or acts the jury found warranted an award of punitive damages against Allied. The information sought concerned the jury's determination of appropriateness, not amount. As the determination concerning the appropriateness of punitive damages had already been made prior to Allied submitting this interrogatory, the interrogatory was untimely.
 {¶ 121} The fourth assignment of error is overruled.
 V {¶ 122} In appellant's fifth assignment of error, it maintains the trial court erred in excluding certain testimony of Dr. Kenny, its expert, regarding the results of the MMPI test taken by Waters. We disagree.
 {¶ 123} Evid.R. 705 covers the disclosures of facts or data underlying an expert opinion. The rules states, in relevant part:
 {¶ 124} "The expert may testify in terms of opinions or inferences and give his reasons therefore after disclosure of the underlying facts or data. The disclosure may be a response to a hypothetical question or otherwise."
 {¶ 125} Before the testimony of Dr. Kenny, the trial court permitted a lengthy argument between the parties as to whether Evid.R. 705 could preclude the testimony of Dr. Kenny with regard to the MMPI. While appellants had requested the raw data of the MMPI, they were not provided the questions comprising the test. Accordingly, Waters moved for the exclusion of any testimony in the form of an opinion or answer to a hypothetical question in which Dr. Kenny based his opinion on the MMPI. After hearing arguments of all parties, the trial court concluded the testimony should be excluded.
 {¶ 126} Evid.R. 705 applies to preclude the testimony of an expert whose opinion is based upon facts and data not disclosed. The record demonstrated Waters requested disclosure of the underlying facts and data regarding the MMPI, but the same was never produced. Accordingly, we find no abuse of discretion in the trial court's decision to preclude Dr. Kenny's testimony.
 {¶ 127} Appellant's fifth assignment of error is overruled.
 VI. {¶ 128} In appellant's sixth assignment of error, it maintains the trial court erred in failing to grant a new trial pursuant to Civ.R. 59(A). We disagree.
 {¶ 129} The standard of review and the law for a grant of a new trial pursuant to Civ.R. 59 is set forth in our discussion of Bigler's fourth assignment of error, supra.
 {¶ 130} Within this assignment of error, appellant contends the previously assigned errors, including the punitive damage instruction, permitting irrelevant and prejudicial testimony of coworkers, and excluding the testimony of Dr. Kenny with regard to the results of the MMPI, demonstrated the trial court's abuse of discretion in failing to grant its motion for a new trial. However, in light of the fact this Court has found no error in these assigned errors, we find no abuse of discretion on the part of the trial court in its denial of a new trial based upon their cumulative effect.
 {¶ 131} Further, appellant contends the evidence did not support the actual damages awarded and therefore, the award was clearly excessive and the result of passion and prejudice. As a result of Allied's actions set forth herein, the jury heard considerable testimony as to the damages suffered by Waters. We can find no abuse of discretion in the trial court's decision to deny appellant's motion for a new trial based upon excessive damages.
 {¶ 132} Finally, appellant also argues Waters' counsel made inappropriate closing arguments. Because this argument was not separately assigned, we do not address it. See App.R. 12, 16.
 {¶ 133} Appellant's sixth assignment of error is overruled.
 VII. {¶ 134} In appellant's seventh assignment, it maintains the award of attorney fees was excessive and unsupported by competent, credible evidence. We disagree.
 {¶ 135} A trial court may award attorney fees to a plaintiff who prevails on a claim for punitive damages. See Galmish v. Cicchini (2000),90 Ohio St.3d 22, 35, 734 N.E.2d 782, 795; Columbus Finance, Inc. v.Howard (1975), 42 Ohio St.2d 178, 183, 327 N.E.2d 654, 658. "In other words, "'[a]ttorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted.'"Galmish, 90 Ohio St.3d at 35, 734 N.E.2d at 795 (quoting Zoppo v.Homestead Ins. Co. (1994), 71 Ohio St.3d 552, 558, 644 N.E.2d 397, 402).
 {¶ 136} The appropriate amount of attorney fees to award in a given case rests in the sound discretion of the trial court. See Bittnerv. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143, 146, 569 N.E.2d 464,467. Thus, a reviewing court should not reverse a trial court's determination as to the amount of attorney fees absent an abuse of that discretion. Id. at 146.
 {¶ 137} In determining the amount of attorney fees, a court should consider the following factors: (1) the time and labor involved in maintaining the litigation; (2) the novelty, complexity and difficulty of the questions involved; (3) the professional skill required to perform the necessary legal services; (4) the experience, reputation and ability of the attorneys; (5) the miscellaneous expenses of the litigation; (6) the fee customarily charged in the locality for similar legal services; and (7) the amount involved and the results obtained. E.g., Villella v.Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 41, 543 N.E.2d 464, 470.
 {¶ 138} In Landis v. Grange Mut. Ins. Co. (1998), 82 Ohio St.3d 339,342-343, 695 N.E.2d 1140, 1143, the court held that to award attorney fees to the prevailing party based on that party's contingent fee agreement with the party's legal counsel constitutes an abuse of discretion. The court noted that such an agreement is a bargained contract that allocates risk and reward between counsel and client. There is no reason, however, for the losing party to be bound by that agreement. The Court explained that the losing party "did not receive the benefit of transferring risk to an attorney" and, more importantly, "did not bargain for the contingency fee contract." Id.
 {¶ 139} Other Ohio courts have taken similar positions. In Stacyv. Nationwide Mut. Ins. Co. (1998), 125 Ohio App.3d 658, 672,709 N.E.2d 519, 528-529, the court held that the trial court erred by using a contingent fee agreement to award attorney fees because it was unfair to hold a third-party adversary to the terms of another's bargain. In Sauder v. McKeown (Mar. 19, 2001), Richland App. No. 00-CA-81, unreported, the court found no error in the decision to reject a contingency fee contract and to award attorney fees on the basis of actual hours worked and services provided.
 {¶ 140} The foregoing cases indicate although the existence of a contingent fee agreement is one factor to consider when a court determines a reasonable amount of attorney fees to award with punitive damages, it may not be the controlling factor.
 {¶ 141} Specifically, appellant contends the trial court failed to take into consideration the plaintiff's failed to keep contemporaneous time records; Waters did not succeed on all claims; Waters' attorneys charged for duplicative legal services by having three lawyers perform every task; and the plaintiffs charged a rate not reasonably negotiated or recognized as reasonable in Tuscarawas County.
 {¶ 142} Waters points to the record to demonstrate her claims were extremely time intensive, and firms billing on an hourly basis in Tuscarawas County were unwilling to take such a case. The attorneys testified because they were working under a contingent agreement, they did not keep contemporaneous records, but could estimate the hours from their files, notes, and memories of the time they spent on the case. Each attorney testified as to their hourly rate.
 {¶ 143} Appellant cannot affirmatively demonstrate from this record the trial court did not consider the aforementioned factors when reaching the decision as to the amount of attorney fees awarded to Waters. Because the April 1, 2002 Judgment Entry stated only that it found attorney fees were appropriate and awarded attorney fees, we must presume the trial court considered all the relevant factors. Even though the trial court chose to award attorney fees in an amount roughly equal to the contingent agreement, the award was far less than the hourly rate of Waters' attorneys for the time spent. In light of the fact the record supported a higher award of attorney fees based upon the hours expended and the billable rates, we find no abuse of discretion in the trial court's calculation of attorney fees.
 {¶ 144} Appellant's seventh assignment of error is overruled.
 CROSS APPEAL {¶ 145} In Waters' cross appeal, she contends the trial court erred in denying her motion for post-judgment interest. We disagree.
 {¶ 146} The determination to award prejudgment interest rests within the trial court's sound discretion. Scioto Mem. Hosp. Assn., Inc.v. Price Waterhouse (1996), 74 Ohio St.3d 474, 479, 659 N.E.2d 1268.
 {¶ 147} R.C. 1343.03(C) reads:
 {¶ 148} "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortuous conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."
 {¶ 149} "The purpose of R.C. 1343.03(C) is to encourage litigants to make a good faith effort to settle their case, thereby conserving legal resources and promoting judicial economy." Peyko v. Frederick
(1986), 25 Ohio St.3d 164. "The statute was enacted to promote settlement efforts, to prevent parties who have engaged in tortuous conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting." Kalain v. Smith (1986), 25 Ohio St.3d 157, 159,
 {¶ 150} The statute sets forth certain requirements. First, a party seeking interest must petition the court no later than fourteen days after entry of judgment. Moskovitz v. Mt. Sinai Med. Ctr. (1994),69 Ohio St.3d 638, 656; Cotterman v. Cleveland Elec. Illum. Co. (1987),34 Ohio St.3d 48, 517 N.E.2d 536, paragraph one of the syllabus. Second, the trial court must hold a hearing on the motion. Moskovitz at 656. Third, to award prejudgment interest, the court must find that the party required to pay the judgment failed to make a good faith effort to settle and, fourth, the court must find that the party to whom the judgment is to be paid did not fail to make a good faith effort to settle the case. R.C. 1343.03(C). Id.
 {¶ 151} The statute uses the word "shall." Therefore, if a party meets the four requirements of the statute, the decision to allow or not allow prejudgment interest is not discretionary. Id. What is discretionary with the trial court is the determination of lack of good faith. Id. Just as in Allied's last assignment of error, Waters can make no record demonstration the trial court failed to consider the applicable factors in arriving at its determination pre-judgment interest was not warranted. Accordingly, we find no abuse of discretion in the trial court's decision.
 {¶ 152} Waters' sole cross-assignment of error is overruled.
 {¶ 153} The judgment of the Tuscarawas County Court of Common Pleas awarding damages to Patricia Waters against appellant Robert Bigler in the amount of $75,000 for intentional infliction of serious emotional distress is vacated. The judgment of the court granting appellee Patricia Waters damages in the amount of $75,000 on her claim against appellant Allied Machine and Engineering Corporation on the claim for intentional infliction of emotional distress is vacated. In all other respects, the judgment of the court is affirmed.
 {¶ 154} By: Gwin, P.J., and
 {¶ 155} Farmer, J. concur
 {¶ 156} Hoffman, J. dissents in part;
 {¶ 157} concurs in part.
 {¶ 158} Topic: Sexual Harassment